

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
06/23/2017

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **IRASEL SAND, LLC,** | § | Case No. 17-31148 |
| | § | |
| Debtor. | § | **Chapter 11** |
| | § | |

### MEMORANDUM OPINION REGARDING THE DISMISSAL OF THE DEBTOR'S CHAPTER 11 CASE
### [Doc. No. 191]

### I.  INTRODUCTION

Irasel Sand, LLC (the "Debtor"), a company that provides sand used in fracking, failed to comply with a prior ruling of this Court that required it to either (1) obtain a final agreement on post-petition financing and use of cash collateral, or (2) face dismissal. The Court gave the Debtor thirteen days to comply with this ruling. The Debtor failed to obtain a final agreement on post-petition financing and use of cash collateral; therefore, the Court found that it was in the best interest of the estate and the creditors to dismiss the case for cause. Thus, the Court issued an order dismissing the above-styled Chapter 11 case. [Doc. No. 191]. The findings of fact and conclusions of law set forth below memorialize this Court's ruling.

### II.  FINDINGS OF FACT

On February 27, 2017, because of the oil and gas downturn of 2015, the Debtor attempted to file for relief under Chapter 11 (the "Petition"). [Doc. No. 1]; [Tape Recording, Mar. 3, 2017 Hearing at 2:19:47–2:20:02 P.M.]. The Court uses the term "attempted" because this case has a checkered history of proper filing. Louis Butler ("Mr. Butler"), the CEO of the Debtor's parent

company, Irabel, Inc.[1] ("Irabel"), signing on behalf of Irabel, solely approved the filing of the Debtor's bankruptcy. [Doc. No. 1, p. 7 of 7]. However, at the time of the filing, Irabel and Select Sand, LLC ("Select Sand") each owned a 50% interest in the Debtor. [*Id.* at p. 5 of 7]. Thus, a question arose as to whether Irabel, without approval from Select Sands, had the power to authorize the filing of the Petition. [Tape Recording, Mar. 3, 2017 Hearing at 2:08:08– 2:11:22 P.M.]. While Select Sand subsequently ratified the Petition, [Doc. No. 24, p. 3 ¶ 6], the questionable filing at the outset has cast a pall over the integrity of the filing.

In addition to the problem concerning the filing of the Petition, the Debtor also faced another issue: whether it would be able to reach a final agreement with its debtor-in-possession ("DIP") lender, Carousel Specialty Products ("Carousel"), to obtain post-petition financing and permission to use cash collateral. The Court held various emergency hearings regarding these issues, and issued interim orders approving certain post-petition financing and use of cash collateral. [Doc. Nos. 34 & 151]. The most recent interim order was entered after the hearing held on April 27, 2017. At that hearing, the Debtor asserted that it would be able to exit bankruptcy by October 2017 if: (1) it obtained an increase of $500,000.00 in financing from Carousel; (2) it completed various improvements worth over $1.0 million to increase productivity; and (3) it successfully entered into a "take or pay" contract with Sanchez Energy ("Sanchez"). [Apr. 27, 2017 Tr. 13:1–17:11, 20:3–21:13]. Based upon the record made at this hearing, the Court entered a second interim order on May 3, 2017, and this order set forth that the final hearing on post-petition financing would be held on May 18, 2017. [Doc. No. 151].

Then, on May 18, 2017, the Court held what it thought was to be the final hearing. However, the Debtor's proposed counsel informed the Court that the Debtor had not yet reached a final agreement with Carousel regarding DIP financing and the use of cash collateral. [Tape

---

[1] Irabel is currently insolvent and has been under receivership since April 4, 2017. [Apr. 27, 2017 Tr. 6:16–21].

Recording, May 18, 2017 Hearing at 2:35:00–2:35:11 P.M.]. The Court expressed its concern that if the parties could not reach an agreement, then "there's no way [the Debtor] is going to be reorganized and I'm not going to let attorney time and court time be used when we have a patient that is dying a quick death." [*Id.* at 5:10:00–5:10:13 P.M.]. The Court then gave the Debtor until May 30, 2017 (i.e., thirteen days) to reach a final agreement on post-petition financing and cash collateral usage, or else face dismissal of the case. [*Id.* at 5:09:17–5:09:26 P.M.].

On May 30, 2017, the Debtor returned to Court and, in response to whether it had reached a final agreement on post-petition financing and the use of cash collateral, proposed counsel stated that there was no agreement with either Carousel or any alternative lender. [Tape Recording, May 30, 2017 Hearing at 11:44:55–11:44:59 A.M.]. In addition, the parties informed the Court of other developments in the case, namely, that Carousel had finalized an agreement with Irabel's receiver and Select Sand that would make Carousel the new 100% owner of the Debtor. Specifically, counsel for Carousel stated the following:

> At this point, Carousel would like dismissal of the case. And, the reasons for that being we finalized the deal with Irabel's receiver that was to purchase the equity interest in the debtor through the receivership. The state court in Beaumont [presiding over Irabel's receivership proceeding] has entered a final order approving that sale, so now, Carousel controls half the interest in . . . Irasel, the debtor, through Irabel's interest and has also signed an option agreement with Select Sand, the other 50% owner, or by it is acquiring 50% of Select Sand—or 100% in Select Sand's interest in the debtor. Select Sand has also given a proxy to Carousel. The proxy allows Carousel to vote Select Sand's interest. This morning, the unanimous consent was signed by the 100% owners of this debtor removing Irabel as the manager of the debtor and appointing Carousel—Mr. Mitchell in particular—as the new manager. And, as the new manager of the debtor, we would like this case to be dismissed at this time.

[*Id.* at 11:52:30–11:53:41 A.M.].

3

Based upon the above-referenced factual background, and the Debtor's poor financial condition as reflected in the Debtor's most recent monthly operating report, the Court finds cause to dismiss the case, as discussed below.

### III.   CONCLUSIONS OF LAW

#### A.  Jurisdiction

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11."  District courts may, in turn, refer these proceedings to the bankruptcy judges for that district.  28 U.S.C. § 157(a).  In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because a dismissal of a case necessarily affects the administration of the bankruptcy estate.  Additionally, this matter is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Whether to dismiss a Chapter 11 case is a matter that can arise only in a bankruptcy. *Martensen*

4

*v. U.S. Tr.*, No. 4:CV91-3080, 1992 WL 67297, at *1 (D. Neb. Apr. 1, 1992) ("Dismissal of a bankruptcy case is a proceeding that by its very nature can only arise in bankruptcy . . . .").

## B.  Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1) because the Debtor's principal place of business was in the Southern District of Texas for the 180 days preceding the filing of the Petition.

## C.  Constitutional Authority to Enter a Final Order Dismissing a Chapter 11 Case

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any matter brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503. As already noted above, the pending matter before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here. A core proceeding under 28 U.S.C. § 157(b)(2)(A) is entirely different than a core proceeding under 28 U.S.C. § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."). *See also In re Davis*, 538 Fed. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S.

Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under 28 U.S.C. § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the matter at bar.  In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, whether to dismiss this case is governed entirely by an express Bankruptcy Code provision—namely, 11 U.S.C § 1112(b)[2]—as well as judicially-created law from federal courts as to how this provision should be applied.  Stated differently, the matter before the Court does not involve solely state law, but rather heavily involves bankruptcy law.  For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order dismissing this Chapter 11 case.  *In re Lake Michigan Beach Pottawattamie Resort, LLC*, 547 B.R. 899, 902–03 (Bankr. N.D. Ill. 2016) ("A proceeding for dismissal of a bankruptcy case under section 1112(b) may only arise in a case under title 11 and is a matter in which a bankruptcy judge has constitutional authority to enter a final order.") (citations omitted).

---

[2] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

**D.  The Debtor's Chapter 11 Case Can be Dismissed**

1.  After Notice and a Hearing, §§ 1112(b) and 105 Allow the Court to *Sua Sponte* Dismiss a Chapter 11 Case for Cause

Section 1112(b) states that "on request of a party in interest, and after notice and a hearing, the court shall . . . dismiss a case under the chapter . . . for cause." Further, § 105(a) states that:

> No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

While § 1112(b) provides that a "party in interest" can make a request for dismissal, when read in conjunction with § 105, judges in the Southern District of Texas, and various other courts, have concluded that a bankruptcy court has power to dismiss a case *sua sponte* for cause. *See, e.g., In re Antelope Techs., Inc.*, No. 07-31159-H3-11, 2010 U.S. Dist. LEXIS 73456, at *11–12 (S.D. Tex. July 21, 2010); *In re Starmark Clinics, LP*, 388 B.R. 729, 735 (Bankr. S.D. Tex. 2008); *see also In re Alston*, No. 1:14-BK-03454MDF, 2017 WL 213805, at *2–3 (Bankr. M.D. Pa. Jan. 18, 2017); *Kingsway Capital Partners, LLC v. Sosa*, 549 B.R. 897, 902–03 (N.D. Cal. 2016); *In re Munteanu*, No. 06-CV-6108(ADS), 2007 WL 1987783, at *3 (E.D.N.Y. June 28, 2007). Further, the Fifth Circuit has suggested that it agrees with this premise. *See Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1071 n.1 (5th Cir. 1986).

The Code defines "cause" for purposes of § 1112(b) with an enumerated list including, in pertinent part: "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." § 1112(b)(4)(A). However, "'this list is not exhaustive' and courts should 'consider other factors as they arise.'" *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) (quoting S. Rep. No. 989, at 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5903;

H.R. Rep. No. 595, 95th Cong., at 406 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6362).  In evaluating cause, the Fifth Circuit requires courts to examine the totality of the circumstances. *Little Creek*, 779 F.2d at 1072–74; *Antelope*, 2010 U.S. Dist. LEXIS, at *14–15; *Starmark Clinics*, 388 B.R. at 736.  Indeed, a bankruptcy court has wide discretion in evaluating cause. *See In re TMT Procurement Corp.*, 534 B.R. 912, 921 (Bankr. S.D. Tex. 2015).  Thus, this Court, *sua sponte*, can dismiss the Debtor's case.

2.    This Court Provided Sufficient Notice and Held a Hearing

Before the Court can *sua sponte* dismiss a case under § 1112(b), it must ensure there is proper notice and a hearing.  As the Fifth Circuit has stated in a different but analogous context, "fairness requires that a litigant have the opportunity to be heard before a claim is dismissed, except where the claim is patently frivolous." *See Century Sur. Co. v. Blevins*, 799 F.3d 366, 372 (5th Cir. 2015).  In so doing, fairness "requires both notice of the court's intention and an opportunity to respond." *Id.* at 373; *see also In re Estate of Patterson*, 64 B.R. 807, 808 (Bankr. W.D. Tex. 1986) ("[A] court should not engage in the practice of *sua sponte* dismissal absent notice and adequate opportunity to be heard."); *In re Munteanu*, 2007 WL 1987783, at *5 (reversing a court's *sua sponte* dismissal of a case under § 1112(b) when the court failed to give notice with "a meaningful opportunity to respond").  However, § 102(1) only requires such notice and opportunity for hearing "as is appropriate in the particular circumstances."  Stated differently, "the concept of notice and a hearing is flexible and depends on what is appropriate in the particular circumstance." *In re Tennant*, 318 B.R. 860, 870 (B.A.P. 9th Cir. 2004).

Here, this Court satisfied the due process requirement under the particular circumstances in this case. *See In re Krueger*, 812 F.3d 365, 370 (5th Cir. 2016) (finding that debtor's right to due process was "vindicated" when the debtor had notice of the grounds for the pending

8

dismissal of his Chapter 7 case and the court held a hearing allowing him an opportunity to respond). On May 18, 2017, this Court, on the record, apprised the Debtor that it would dismiss the entire case if it were unable to obtain final agreements on post-petition financing and the use of cash collateral.  [Tape Recording, May 18, 2017 Hearing at 5:09:17–5:10:46 P.M.].   The Court then gave the Debtor thirteen days to reach agreement on these issues, [*id.* at 5:09:17–5:09:26 P.M.]—a deadline which was reasonable given that the Debtor had already had ample time to negotiate final post-petition and cash collateral agreements with Carousel.  On May 30, 2017, the parties returned to court, and proposed counsel for the Debtor informed the Court that: "There is not an agreement with Carousel [or an alternate lender] as to cash collateral or DIP financing, Your Honor."  [Tape Recording, May 30, 2017 Hearing at 11:44:55–11:44:59 A.M.]. Thus, having given the Debtor notice, time to reach an agreement with its existing DIP lender or with another lender, and a hearing to respond, this Court satisfied the due process requirements of § 1112(b).

 3.  Considering the Totality of the Circumstances, the Court Finds that this Case Should be Dismissed

 Having satisfied due process considerations, the Court now turns to the issue of whether it should dismiss this case.  It will do so if the two prongs of § 1112(b)(4)(A) are satisfied.  First, there must be a substantial or continuing loss to the estate; and second, there must be no likelihood of rehabilitation.  § 1112(b)(4)(A); *TMT*, 534 B.R. at 918.  To avoid dismissal under this section, "[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization."  *Matter of Canal Place Ltd.*, 921 F.2d 569, 577 (5th Cir. 1991). Here, the Debtor's woeful financial performance and poor financial condition, plus its current lack of post-petition financing and inability to use cash collateral, convinces this Court that there

is a substantial or continuing loss to the estate, and there is no likelihood of a successful rehabilitation.

   a.   *There is a Substantial or Continuing Loss to the Debtor's Estate*

Satisfying the first prong of § 1112(b)(4)(A) can be done in two ways. One approach is to prove that there is a substantial loss to the estate. In *TMT*, the court notes that it is *not* necessary to find both a substantial *and* continuing loss in order to meet the first prong of § 1112(b)(4)(A). 543 B.R. at 918. Focusing on "substantial loss," the *TMT* court found that this phrase means that "the loss is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors." *Id.* It further found that "negative cash flow alone can be sufficient cause to dismiss or convert under § 1112(b)." *Id.* (internal citation omitted).

Here, the Debtor has scheduled property with a total value of $3,098,230.24, which is completely encumbered. [Doc. No. 101, p. 8 of 8]. Further, the Debtor has scheduled the following debts: (1) a claim held by First NBC Bank for $4,167,907.64 secured by all of the Debtor's property having a value of $3,098,322.24, leaving a deficiency of $1,069,585.40, [Doc. No. 101-1, p. 1 of 2]; and (2) unsecured claims totaling $3,426,099.75, [Doc. No. 101-2, p. 13 of 13]. Further, in the Debtor's Monthly Operating Report ending April 30, 2017 (the "MOR"), the Debtor reported information reflecting that its cash flow has been negative. [Doc. No. 182]. The MOR reflects that the Debtor had a negative net cash flow of $64,864.27 for the month of April 2017. [*Id.* at p. 8 of 11]. Moreover, the MOR indicates that the Debtor has: (1) negative equity of $5,650,546.06, [*id.* at p. 3 of 11]; (2) a balance of $940,960.55 owed under its DIP loan, an increase of almost $850,000.00 since March 31, 2017, [*id.* at p. 4 of 11]; (3) post-petition liabilities of $1,026,249.80, [*id.*]; and (4) a post-petition net loss of $61,392.96 through April 30,

10

2017, [*id.* at p. 6 of 11]. Thus, just like the debtors in *TMT*, "[t]here is no doubt [that the Debtor has] suffered a substantial loss on a pure balance sheet basis." 534 B.R. at 918. Further, the MOR shows that the Debtor is failing to make a profit. Therefore, this information alone sufficiently proves that the Debtor has suffered a "substantial loss" to its estate—one of the two conditions that satisfies the first prong of § 1112(b)(4)(A).

The second approach to satisfying the first prong of § 1112(b)(4)(A) is to prove that there is a "continuing loss" to the estate. This term, as defined by the court in *In re Moore Construction, Inc.*, requires courts to "look beyond a debtor's financial statement and make a full evaluation of the present condition of the estate." 206 B.R. 436, 237–38 (Bankr. N.D. Tex. 1997). Here, this full evaluation shows that the Debtor's estate is suffering a continuing loss. First, Mr. Butler testified that if the effort to obtain additional post-petition financing failed, then it "would cause irreparable harm to the debtor" and the Debtor would be unable to "continue to operate any further." [Mar. 10, 2017 Tr. 55:10–16]. Proposed counsel for the Debtor informed the Court that such financing was not currently available. [Tape Recording, May 30, 2017 Hearing at 11:44:55-11:44:59 A.M.]. Hence, the Debtor can do nothing at this point but suffer continuing losses. Second, the existing interim DIP agreement requires that the Debtor transfer to Carousel all of the Debtor's receivables and net cash proceeds, [Doc. No. 37–4, pp. 31–32 of 124]; therefore, the Debtor has no unencumbered property which can be used to obtain a second DIP loan from some lender other than Carousel. Third, Mr. Butler testified that the Debtor would likely be able to pay off Carousel by August and exit bankruptcy by October only if the Debtor was able to finalize the agreement with Sanchez. [Apr. 27, 2017 Tr. 18:14–21:13]; [Doc. No. 143, pp. 6–7 of 18]. However, there is no evidence that any agreement with Sanchez has come to fruition, which in turn means that the Debtor will not be able to pay off Carousel and

successfully exit from bankruptcy. Taken collectively, these facts underscore that the Debtor is also operating at a "continuing loss," which is an alternative basis for satisfying the first prong of § 1112(b)(4)(A).

In sum, the Court finds that there is a substantial loss to the Debtor's estate, and that there is also a continuing loss to the Debtor's estate. There is no question that the first prong of § 112(b)(4)(A) is satisfied.

### b. There is No Reasonable Likelihood of Rehabilitation

The Court now turns to the second prong of § 1112(b)(4)(A): the likelihood of rehabilitation—or lack thereof. Collier's Treatise defines this second prong as "whether the debtor's business prospects justify continuance of the reorganization effort [and] . . . [r]ehabilitation means to reestablish a business." 7 Collier on Bankruptcy ¶ 1112.04(6)(a)(ii) (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017). The court in *In re L.S. Good & Co.* found that "rehabilitation," as used in § 1112(b)(1)[3] means "to put back in good condition; re-establish on a firm, sound basis." 8 B.R. 315, 317 (Bankr. N.D.W. Va. 1980) (internal citation omitted). In that case, the court found that the likelihood of rehabilitation did not exist when the court was "unaware of any sources offering to lend the capital essential to the rehabilitation" of the debtor. *Id.* at 318; *see also Quarles v. U.S. Tr.*, 194 B.R. 94, 97 (W.D. Va. 1996) (finding that there was no likelihood of rehabilitation when debtor was generating no profits and reorganization depended on speculative outcomes); *In re Cont'l Holdings*, 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994) (finding that there was no likelihood of rehabilitation when debtor lacked a reasonably certain source of income).

---

[3] This statute has been amended and is now § 1112(b)(4)(A). *Compare* Act of Nov. 8, 1978, Pub. L. No. 95-598, § 1112, 92 Stat. 2549, 2630 (1978) (creating "a uniform Law on the Subject of Bankruptcies" and defining reasons for dismissal under § 1112(b)(1)) *with* The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, § 442, 119 Stat. 23, 115–16 (2005) (amending title 11 and allowing dismissal for enumerated reasons under § 1112(b)(4)).

In another case, one of the creditors sought dismissal of the case by asserting that there was no possibility of reorganization because the Debtor had no source of income or funding for a plan of reorganization. *In re 865 Centennial Ave. Assocs. Ltd.*, 200 B.R. 800, 809 (Bankr. D.N.J. 1996). In that case, the debtor had no equity in its property because its largest creditor held a lien exceeding the value of the property, and an expert testified that the business could not operate without outside financing. *Id.* at 811. Under these circumstances, the court agreed with the creditor and dismissed the case because the debtor failed to show that there was a "possibility of a successful organization." *Id.* In so holding, the court noted that no matter how sincere a debtor may be, the court "is not bound to clog its docket with visionary or impracticable schemes of resuscitation." *Id.* at 810. Further, it found that "[w]here the debtor has no cash flow and no source of income and where the claims against the property of the debtor exceed the property's value, a debtor has not demonstrated a reasonable likelihood of rehabilitation and dismissal may be appropriate." *Id.*

Here, the facts are very similar to *L.S. Good* and *865 Centennial*. The Debtor has negative equity because First NBC Bank's claim for $4,167,907.64 is secured by all of the Debtor's assets worth only $3,098,322.24, leaving a deficiency of $1,069,585.40. [Doc. No. 101-1, p. 1 of 2]. Second, Mr. Butler, the individual who has substantial experience about how the Debtor's business operates, [*see, e.g.*, Mar. 10, 2017 Tr. 16:21–19:20], testified, uncontroverted, that the Debtor's operations would fail without post-petition financing, [*id.* at 55:10–16]—and here, there is no additional post-petition financing in place. Third, the MOR reflects that the Debtor had a negative net cash flow of $64,864.27 for the month of April 2017, a net loss of $61,362.96 through the month of April 2017, [Doc. No. 182, pp. 6, 8 of 11], and virtually no cash on hand as of April 30, 2017, [*id.* at p. 2 of 11]; therefore, the Debtor cannot—

to use the *L.S. Good* court's expression—be "put back in good condition." 8 B.R. at 317. Under these circumstances, the Court finds that there is no reasonable likelihood of rehabilitation for the Debtor.

Finally, this Court, in assessing whether cause exists to dismiss a case under § 1112(b), should "consider other factors as they arise." *Brown*, 951 F.2d at 572. Here, there are other factors. Carousel, the new 100% owner of the Debtor, wants the case dismissed. [Tape Recording, May 30, 2017 Hearing at 11:52:30–11:53:41 A.M.]. In addition, the case has a checkered history of proper filing. [Tape Recording, Mar. 3, 2017 Hearing at 2:08:08–2:11:22 P.M.]. Indeed, one court gave substantial weight to these facts when dismissing a case. *See In re Real Homes, LLC*, 352 B.R. 221, 222–28 (Bankr. D. Idaho 2005) (dismissing a bankruptcy case when the 100% owner did not authorize or ratify the filing and when the owner subsequently requested the case be dismissed).

Based upon all of the above-discussed circumstances, the Court finds that there is no reasonable likelihood of the Debtor's rehabilitation; therefore, the second prong of § 1112(b)(4)(A) is satisfied.

## IV.   CONCLUSION

For the reasons stated herein, the Court finds that the Debtor's case should be dismissed for cause pursuant to § 1112(b)(4)(A) because of the substantial or continuing loss to the Debtor's estate and the absence of a reasonable likelihood of the Debtor's rehabilitation. An order dismissing this case has already been entered on the docket. [Doc. No. 191].

Signed on this 23rd day of June, 2017.

Jeff Bohm
United States Bankruptcy Judge